```
                      UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS


_____
                                   )
UNITED STATES,                     )
                                   )
          Appellee,                )
                                   )    CRIMINAL NO. 11-CR-10160-PBS
     v.                            )
                                   )
STEVEN G. MARSHALL,                )
                                   )
          Appellant.               )
_____)
```

### MEMORANDUM AND ORDER

November 9, 2012

Saris, U.S.D.J.

### I.   INTRODUCTION

Steven Marshall, a Vietnam War veteran and a letter carrier with 26 years of experience, appeals the magistrate judge's judgment of conviction for obstruction of mails, under 18 U.S.C. § 1701.  He has appealed pursuant to 18 U.S.C. § 3402.  After hearing, and a review of the evidence, the Court **AFFIRMS**.

### II.   THE FACTS

The government produced evidence to support the following facts.

**1.   Undeliverable Mail**

Marshall was employed as a mail carrier at the Greenfield, Massachusetts Postal Service Annex.  Prior to leaving the Annex

1

every day to deliver the mail on his route, he had to "case" his mail, a process of sorting the mail by address and then sequencing it for delivery.  The postal worker is instructed to discard undeliverable mail during the casing process, placing it into a bin to be marked "undeliverable bulk business mail," which is sometimes referred to as "no value mail" or "NOVM."  The discarded mail is then supposed to be checked by a supervisor, and, if it is indeed undeliverable, it is recycled.

Mail is deemed undeliverable if the home or apartment of the addressee is vacant.  Mail carriers maintain a list of vacant homes in "edit books" that are kept at their work stations at the Annex.  Residential vacancies are determined by the mail carrier delivering to the homes on each mail delivery route.  Carriers are required to update their "edit books" with vacancies monthly.

    2.    **Town Criers**

In 2009 and 2010, James Lengieza was a supervisor at the Greenfield Postal Annex.  In October 2009, Lengieza was informed that there was an "excessive amount" of Town Criers being discarded at Defendant's work station. (Tr. 84).  The Town Criers are town newspapers that have advertisements in them for residents within a town.  A post office customer pays to have them delivered.  The Town Criers typically identified the receiving party as "Current Resident."  Lengieza spoke with Defendant about the issue, telling him to "make sure" all the

deliverable Town Criers were delivered. (Tr. 85). He monitored Defendant for the next two weeks and noticed a dramatic reduction in the number of Town Criers discarded by Defendant. (Id.) He thought the problem had been resolved.

In February 2010, Special Agent Kenneth Velazquez, of the Postal Service Office of Inspector General, began video surveillance of Defendant at the Greenfield Postal Annex and monitored him "casing" his mail. Velazquez focused on days the Town Criers were to be delivered. On February 26, 2010, he observed Defendant, via closed circuit television, sorting the Town Criers. Marshall was both casing the Town Criers and discarding them into his NOVM bin. At times he would do so at a one to one ratio. After the mail carriers left the building, Special Agent Velazquez and Supervisor Lengieza retrieved the NOVM bin from Defendant's work station to determine if the Town Criers discarded by Defendant actually were deliverable. The bin contained 208 discarded Town Criers.

Special Agent Velazquez again monitored Marshall via video surveillance on March 4 and March 18, 2010. (Tr. 33). He followed the same procedure on both days, emerging to count the NOVM mail with Supervisor Lengieza. On March 4, Defendant discarded 183 Town Criers, and on March 18, he discarded 168 Town Criers. While casing and discarding the Town Criers, Defendant would look at the address at times and then not look at the

address at other times.  However, he never took the whole stack of Town Criers and throw them in the NOVM bucket.

On each day that he observed Marshall, Supervisor Lengieza pulled Defendant's "edit book" and compared the Town Criers that Defendant had discarded with the vacant addresses in Defendant's edit book.  Supervisor Lengieza determined 80 to 90 percent of the Town Criers discarded by Defendant on March 4 were deliverable.

### 3. "Walk With"

A "walk with" is a procedure where a postmaster or supervisor walks a mail carrier's route with the carrier to determine if there are any vacancies on the route and to get an accurate assessment of the time it takes for the mail carrier to deliver the route.  In this case, the "walk with" was conducted as part of the investigation of Marshall to determine if the discarded Town Criers were deliverable.  Defendant conducted his "walk with"--not knowing it was part of an investigation--with interim postmaster Joan Bates.  The "walk with" was conducted on March 11, 2010.  That date was chosen so that there would be a record of Defendant discarding deliverable mail both before and after the "walk with."  During the "walk with," Defendant threw out fewer of the Town Criers than he did on either March 4 or March 18.  (Tr. 120).

### 4. Interview and Admissions

On May 27, 2010, Special Agents Velazquez, Allison Glassick, and Gerard Fernandez interviewed Defendant in an office at the Greenfield Postal Annex.  Defendant, both verbally and in writing, admitted to discarding the Town Criers.  In his statement, Defendant said he wasn't aware that discarding the Town Criers was a problem, that he "did deliver them when [he] was walked with, but only to get a street time that was more acceptable for the route," and that from that point on he would "deliver any and all Town Criers to vacant apartments and multi-apartment deliveries."  (Tr. 53-54).  Defendant further stated that, "I'm not saying there's any excuse for it."  (Tr. 119).  He also said that he deemed some of the Town Criers undeliverable because apartments were vacant and because residents requested that he not deliver them.  For example, Defendant indicated that a maintenance man in one building said that he did not want them delivered to the building.  Furthermore, Defendant stated that it was "a waste of energy" to deliver them.  (Tr. 118).

### III. STANDARD OF REVIEW

The Court "must affirm [the conviction] unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt." United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000)(internal quotations omitted).  "In assessing the

sufficiency of evidence, credibility determinations must be resolved in favor of the verdict." United States v. Soto-Beniquez, 356 F.3d 1, 44 (1st Cir. 2003).

### IV.   DISCUSSION

Marshall claims that the government presented insufficient evidence to establish that he "knowingly and willfully obstruct[ed] . . . the passage of the mail."  18 U.S.C. § 1701. To convict a defendant of obstruction of mail, 18 U.S.C. § 1701, the government must prove that the defendant is guilty of (1) willfully and knowingly; (2) obstructing or retarding; (3) the passage of the mail.  United States v. Upshaw, 895 F.2d 109, 110 (3d Cir. 1990); see United States v. Schankowski, 782 F.2d 628, 631 (6th Cir. 1986); United States v. Del Monte, 470 F. Supp. 248, 249 (D. Mass. 1979).  Section 1701 requires a showing that the defendant knew that the effect of her actions would be to obstruct the mail.  Upshaw, 859 F. 2d at 110.  While the First Circuit has not addressed the precise issue of the meaning of "willfulness" under § 1701, the Second Circuit has held that for a mail carrier to "willfully" obstruct the mail, he must have an "illegitimate or improper intent . . . and that an inadvertent or negligent delay of the mail does not violate [the statute]." United States v. Wooden, 61 F.3d 3, 5 (2d Cir. 1995) (holding that evidence that carrier concealed mail by placing it in a

relay box rather than delivering it supported finding of improper motive).

Marshall argues that to be found guilty of "willfully" obstructing the mail, he must have been aware that his conduct was unlawful when discarding the deliverable mail.  The Supreme Court has described the word "willfully" as "a word of many meanings whose construction is often dependent on the context in which it appears."  Bryan v. United States, 524 U.S. 184, 191 (1998) (internal quotations omitted) (involving a charge of "willfully" dealing in firearms without a license).  In Bryan, the Supreme Court held that while "a 'willful' act is one undertaken with a 'bad purpose' . . . the willfulness requirement [in the licensing statute] does not carve out an exception to the traditional rule that ignorance of the law is no excuse; knowledge that the conduct is unlawful is all that is required." Id. at 191, 196.

The First Circuit has provided different meanings of "willfulness" in various contexts. See, e.g., United States v. Allen, 670 F.3d 12, 18 (1st Cir. 2012)(stating in the tax evasion context, willfulness requires "knowledge by the defendant that the conduct is illegal or at least wrongful"); United States v. Gonsalves, 435 F.3d 64, 72 (1st Cir. 2006)(stating in the context of false statement counts "[w]illfulness . . . means nothing more . . . than that the defendant knew that his statement was false

when he made it or . . . consciously disregarded or averted his eyes from its likely falsity"); United States v. Bailey, 405 F.3d 102, 110 (1st Cir. 2005)(stating in the aiding and abetting context, "[p]articipation in a crime is willful if action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done"); see also United States v. Pitrone, 115 F.3d 1, 6 (1st Cir. 1997)("'[W]illfully' . . . sometimes has been construed to require a showing that the defendant knew his behavior transgressed the law."). In the context of § 1701, the caselaw provides that the government had to prove that Defendant had the illegitimate or improper intent to obstruct deliverance of the mail. See Wooden, 61 F.3d at 5.

Marshall claims that he did not have an improper intent when discarding hundreds of Town Criers. Instead of throwing the Town Criers in the trash, Marshall says he placed them in plain view in a bin for "no value mail" and that he believed they would be reviewed by a supervisor to make a final determination whether the mail was deliverable. He says no supervisor ever returned a Town Crier to him for delivery. Marshall also argues he discarded the Town Criers because they were either addressed to vacant apartments or residents requested that he not deliver them. He testified that he had always been informed that "any person can refuse any piece of mail they don't want." (Tr. 182).

When that happened he wrote "refused" on the letter and returned it to the sender.  However, he conceded that he did not follow this practice with the Town Criers he discarded.  He also disputed that his supervisor actually warned him about having too much bulk mail undelivered.

The government counters that Marshall's intent can be proven by the following evidence.  His supervisor, James Lengieza, testified that he had previously informed Marshall "to simply make sure all the good Town Criers were being delivered."  (Tr. 85).  During the two weeks in October 2009 that Lengieza had monitored Marshall, after this admonition, he noticed a dramatic reduction in the number of discarded Town Criers.  Lengieza also testified that, according to Marshall's edit book detailing his mail route, 80 to 90 percent of the discarded Town Criers on March 4, 2010 were actually deliverable.  (Tr. 89-92).  Furthermore, when Marshall conducted his "walk with" with interim postmaster Joan Bates, he also threw out fewer Town Criers.  (Tr. 120).  Finally, in a voluntary interview, Marshall stated that, "I'm not saying there's any excuse for [not delivering the Town Criers]."  (Tr. 119).  After weighing this evidence, the magistrate judge concluded that Marshall knowingly and willfully obstructed the mail beyond a reasonable doubt.  Although she did not provide findings of fact to support her decision, which would have been helpful, she was not legally required to do so unless

requested by either party.  See Fed. R. Crim. P. 23(c). Credibility findings must be resolved in favor of the verdict.

Marshall insists his actions were not willful because some residents told him they did not want the Town Criers.  He testified that one maintenance man in an apartment complex told him not to deliver Town Criers anymore.  If this case boiled down to a dispute about whether a letter carrier should know it was unlawful not to deliver "junk mail" that a resident expressly told him not to deliver, the government would have a harder time arguing it had sufficient evidence to prove "willfulness" beyond a reasonable doubt.  Here, however, the court had evidence to discredit defendant's testimony about his reasons for not delivering the mail: the admonition of the supervisor, the "walk with" with the interim postmaster, the defendant's own statement, and the very large number of "deliverable" Town Criers that had been discarded.  To be sure, the post office could have achieved its goal by disciplining Marshall, a veteran and 26-year employee who had apparently no prior adverse or negative employment reports, rather than prosecuting him.  However, when viewed in the light most favorable to the government, the evidence is sufficient to support the judgment of conviction that Marshall had the specific improper intent to obstruct the delivery of deliverable Town Criers.

Marshall also alleges that various pretrial procedural issues violated his due process rights.  These claims are without merit.  He complains that because the trial was delayed, the government had months to respond to Marshall's motions in limine and beef up its case.  Marshall has provided no legal support that such delay violated due process or that his motions in limine were confidential attorney work product.  Moreover, while Marshall was provided only three days notice that Special Agent Velazquez would testify at trial--instead of the seven days indicated in the Local Rules--he fails to allege any prejudice this caused, and the magistrate judge permitted him additional time to prepare cross-examination.  (Tr. 12).  Finally, the magistrate judge's failure to issue a scheduling order did not violate Marshall's due process rights or result in prejudice.

## ORDER

The magistrate judge's judgment of conviction is **AFFIRMED**.


/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge